# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00431-SCT

*LATERRENCE LENOIR a/k/a LATERRENCE A.*
*LENOIR a/k/a LATERRENCE AWSON LENOIR*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/14/2016 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| TRIAL COURT ATTORNEYS: | RENEE H. BERRY |
| | ALEXANDER C. MARTIN |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| | RENEE H. BERRY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN McCLINTON |
| DISTRICT ATTORNEY: | ALEXANDER C. MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/02/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    A Copiah County jury convicted Laterrence Lenoir of two counts of armed robbery

and one count of conspiracy to commit armed robbery.[1] Lenoir appeals his convictions,

---

[1]Lenoir has another case before this Court concerning another alleged robbery. The
case at hand solely concerns the charges stemming from a robbery that occurred at the Dollar
General in Wesson, Mississippi. The other case involving this same defendant is styled

arguing the jury had insufficient evidence to determine that he committed the crime or, alternatively, that his motion for a new trial should have been granted. We disagree and affirm his convictions.

## FACTS AND PROCEDURE

¶2.     This case concerns the events that occurred on September 6, 2012, at a Dollar General store in Wesson, Mississippi. At approximately 10 p.m., three employees of the Dollar General store—Dawn Forrest, Jeffrey Thomas, and Vinshaun Motley—prepared to close the store for the night. Forrest worked on the deposit in the store's office, Thomas used the restroom, and Motley gathered the store's buggies in the parking lot. At this time, two men entered the store and robbed[2] the employees at gunpoint. The men's faces were partially covered and each wore gloves. The men stole approximately $3,600, the store telephone, and the cell phone of each employee.

¶3.     More than three years later, on January 27, 2016, a Copiah County grand jury indicted Laterrence Lenoir on three counts of armed robbery and one count of conspiracy to commit an armed robbery in connection with the events at the Dollar General store.[3] Lenoir was appointed counsel and he pleaded not guilty. On March 14, 2016, a jury trial commenced in the circuit court. The State's case against Lenoir consisted of testimony from the three Dollar

---

*Lenoir v. State*, 2016-KA-00226-SCT.

[2]The defendant here does not dispute that an armed robbery occurred. Rather, Lenoir argues that there is insufficient evidence to show that he committed the crime.

[3]The grand jury also indicted Desmond J. Williams as the other perpetrator of the robbery and conspiracy. Lenoir filed a motion for severance, and the two men were tried separately.

General employees–one of whom testified in exchange for a plea deal[4]–and surveillance footage of the robbery from the store's security system. The following is the evidence admitted against Lenoir during trial.

*Dawn Forrest*

¶4. The State first called Forrest, a part-time manager of the Dollar General Store at the time of the robbery. Forrest testified that she knew Lenoir because Lenoir's girlfriend also worked at the same Dollar General store. Forrest stated that Lenoir generally would go to the store twice a day—once to drop his girlfriend off at work and once to pick her up at the end of her shift.

¶5. Forest testified that she was working on the deposit in the store's office on the night of the robbery. At that time, two men, one wielding a gun, came into the store. Forrest described one of the robbers as taller than the other. The taller robber had the gun and wore a dark-colored, hooded sweatshirt with shorts. Forrest stated that the other robber wore a scarf across his face and had red-tipped, shoulder-length dreadlocks.

¶6. After the robbers entered the store, Forrest recalled that one of the men said,"Give us the money." At first, Forrest thought two kids were playing a joke, but she later became afraid after the taller man with the gun pointed the weapon at Thomas as he exited the restroom. Now afraid, Forrest stated that she was going to do "whatever they asked me to

---

[4]Vinshaun Motley, one of the employees present at the time of the robbery, was later arrested and indicted for the armed robbery of the Dollar General. In response to a plea deal for the lesser charge of accessory after the fact, Motley testified for the State against Lenoir. Thereafter, one of the three counts of armed robbery for which Lenoir was indicted was dismissed.

do." Forrest then gave the men the money from the cash registers and the safe in the front of the store.

¶7.     After giving the men the money, Forrest believed the men would leave; however, the men then demanded the money from the office in the back of the store. Forrest testified that the men "should not have known" about the money in the back. Forrest then led the men to the back of the store, accessible only through the employee break room, and gave the men the money from the office. She also testified that the men took each of the employees' cell phones and the store phone.

¶8.     At this point during Forrest's testimony, the State played video-surveillance footage of the robbery. The footage tracks Forrest's testimony. The video surveillance has no audio of what was said during the commission of the robbery, but it shows two men, one wielding a handgun, holding up the employees and demanding money from the registers. The video also shows Forrest leading the men to the back of the store. At the conclusion of Forrest's testimony, the trial judge admitted Forrest's recovered cell phone into evidence.

¶9.     On cross-examination, Forrest admitted that she could not identify Lenoir as one of the robbers. Forrest claimed she could not see the men's faces at the time of the robbery, and no identification can be made from the blurry surveillance cameras.

*Jeffrey Thomas*

¶10.    Thomas also testified for the State. He testified that he knew Lenoir from church. Thomas told the jury that, while closing the store on the night of the robbery, he had to use the restroom. When he exited the restroom, he encountered the two robbers. Like Forrest, Thomas testified that he first believed someone was playing a joke. But upon seeing the

4

handgun, he told the jury that he became afraid for his life. Thomas testified that he then dropped to the floor and tried not to make eye contact. He also testified that the men stole money and the cell phones of each employee. Thomas, however, could not identify the men who robbed the store.

*Vinshaun Motley*

¶11. The State's final witness was Motley, another Dollar General employee present on the night of the robbery. Motley stated that he had known Lenoir for about four to five years and that he knew Desmond Williams, Lenoir's alleged coconspirator, from school. Motley told the jury that he had seen Lenoir and Williams together "a lot." Motley further testified that Williams had dreadlocks and that Lenoir is taller than Williams.

¶12. At around 3 or 4 p.m. on the day of the robbery, Motley saw Lenoir at the Dollar General store. Lenoir wanted to buy a game from Motley but did not have money at the time to purchase the game. Lenoir told Motley that "he needed to hit a lick first to get some money so he could pay for the game." Motley explained to the jury that "hit a lick" means "to come up on some money by any means."

¶13. Later that night, at around 10 p.m., Motley and his coworkers prepared to close the store for the evening. While he was in the parking lot gathering buggies, Motley saw two men running toward the store. He testified that one of the men "was running . . . with a waddle, and the other man had long hair." When asked who the person running with the "waddle" was, Motley testified: "It kind of looked like [Lenoir's] waddle. [Lenoir's] got a distinct walk from anyone I know." Motley stated that he went into the store to get his

5

manager and, at that time, he was robbed. He identified his recovered cell-phone case but stated that he never got his phone back.

¶14.   Motley then told the jury that, on the day after the robbery, Lenoir met with him about buying the game. He testified that Lenoir gave him money but told him not to worry about the game. Instead, Lenoir told him that he was "sorry" and "to keep [his] mouth closed." Motley told the jury that he assumed Lenoir was talking about the robbery. Motley remained silent for three years, until he was arrested; at that time, he agreed to testify against Lenoir in exchange for a plea deal. On cross-examination, Motley stated that he, like Lenoir and Williams, was charged with armed robbery of the store but that the plea deal diminished his charge to accessory-after-the-fact. Further, he admitted that the videos did not show the robbers' "clear path of walking."

¶15.   Lenoir presented no defense and, at the conclusion of the State's case-in-chief, motioned for a directed verdict. The trial judge denied Lenoir's motion, and the jury subsequently convicted Lenoir of two counts of armed robbery and one count of conspiracy to commit armed robbery. The trial judge sentenced Lenoir to sixteen years for each count of armed robbery, to run consecutively, and also sentenced Lenoir to five years for the conspiracy, to run concurrently with the robbery convictions. The trial judge further denied Lenoir's motions for a new trial, to set aside his sentence, and for judgment notwithstanding the verdict.

¶16.   Lenoir raises two issues on appeal, which we recite verbatim:

I. Whether the paucity of evidence and the attenuated nature of the proceedings denied appellant a fair trial and due process as guaranteed under the Fifth and Sixth Amendments of the Constitution.

6

II. Whether the trial court erred when it denied appellant's motion for a new trial as the verdict was contrary to the weight of the evidence.

## DISCUSSION

**I. Whether the paucity of evidence and the attenuated nature of the proceedings denied appellant a fair trial and due process as guaranteed under the Fifth and Sixth Amendments of the Constitution.**

¶17.    Lenoir first claims that the State offered insufficient evidence for a jury to find beyond a reasonable doubt that Lenoir was one of the men who robbed the Dollar General store. Lenoir argues that "the case against him consisted of no more than one accomplice remembering how he walked three years later." We disagree, finding sufficient evidence linked Lenoir to the robbery.

¶18.    "A motion for judgment notwithstanding the verdict implicates the sufficiency of the evidence." *Cowart v. State*, 178 So. 3d 651, 666 (Miss. 2015) (quoting *Ginn v. State*, 860 So. 2d 675, 684 (Miss. 2003)). While reviewing a case for sufficiency of the evidence,

> [t]his Court considers each element of the offense and reviews all of the evidence in the light most favorable to the verdict. This Court must accept as true all credible evidence consistent with guilt. This Court must give the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." Moreover, matters regarding the weight and credibility given the evidence are the province of the jury. This Court may reverse only when, "with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand.

*Id*. (internal citations omitted).

¶19.    "The elements of armed robbery are: (1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5)

7

by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Id*. (citing Miss. Code Ann. § 97-3-79 (Rev. 2014)). Also, "[t]he only element of conspiracy to commit armed robbery is two or more persons agreeing to commit armed robbery." *Id*. (citing Miss. Code Ann. § 97-1-1(1)(a) (Rev. 2014)).

¶20. Again, Lenoir does not argue that the prosecution failed to provide evidence of any of the above-mentioned elements of armed robbery; rather, Lenoir argues insufficient evidence existed linking him as one of the robbers. For good measure, we find that sufficient evidence was presented for a jury to find, beyond a reasonable doubt, all of the above-mentioned elements. The State introduced three surveillance videos corroborating Forrest's and Thomas's testimony. The testimony and videos show that the men took the cell phones of Forrest and Thomas, as well as the store's money, while brandishing a handgun. Further, both Forrest and Thomas testified that they became afraid after seeing the weapon.

¶21. We also find, "viewing the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the verdict, that the evidence was sufficient to enable a rational jury to find beyond a reasonable doubt" that Lenoir committed the crime. *King v. State*, 47 So. 3d 658, 664 (Miss. 2010). Forrest testified that one of the robbers was tall and that the other man had dreadlocks. Motley later testified that Lenoir was taller than Williams, his alleged coconspirator, and that Williams had dreadlocks. Motley also told the jury that Lenoir and Williams hung out "a lot." Further, Motley testified that the taller man ran with what appeared to be the same distinct "waddle" that Lenoir, whom Motley had known for years, previously had exhibited.

8

¶22. Motley further testified that, just hours before the robbery, Lenoir approached him about buying a game. Lenoir did not have enough money to purchase the game, but he told Motley that he would "hit a lick," (i.e., come up with some money by any means). On the day following the robbery, Motley testified that Lenoir did bring him money. But rather than buy the game from Motley, *Lenoir told Motley that he was sorry and told him to keep his mouth closed*. The jury heard that Motley assumed that Lenoir was telling him to keep his mouth shut about the robbery.

¶23. Further, Forrest testified that the robbers "should not have known" about the extra money located in the office at the back of the store, which was accessible only through the employee break room. The jury heard testimony that Lenoir was familiar with the store because he generally went to the store twice a day to pick up and drop off his girlfriend, who worked there. Giving the State "the benefit of all reasonable inferences that may reasonably be drawn from the evidence," we must conclude that the jury believed Lenoir became privy to the fact that the Dollar General kept additional cash in the back office. ***Ginn***, 860 So. 2d at 685 (quoting ***Sheffield v. State***, 749 So. 2d 123, 125 (Miss. 1999)).

¶24. Lenoir argues that Motley's testimony was inherently unreliable because he was indicted as an accomplice to the robbery and agreed to testify in return for a plea deal. This Court has held that:

> "[W]hen a conviction rests upon accomplice testimony, the uncorroborated testimony of an accomplice may be sufficient to convict the accused." (citation omitted). "But if the accomplice testimony is uncorroborated and is unreasonable, self-contradictory, or substantially impeached, then accomplice testimony is insufficient, and the trial court must direct a verdict of not guilty." (citation omitted).

9

*Id.* (quoting *King*, 47 So. 3d at 664). Although the State presented no evidence corroborating Motley's testimony, we determine that Motley's testimony was not "unreasonable, self-contradictory, or substantially impeached." *King*, 47 So. 3d at 664. Admittedly on cross-examination, Motley conceded that the surveillance videos did not show that he had a clear view of the robber's walking path. We find, however, that this admission did not impeach Motley's testimony concerning Lenoir's gait. Motley testified that he recognized Lenoir's "waddle" when he saw the two men running toward the store as he was outside gathering buggies. The videos show only the robber's movements inside the store.

¶25. More importantly, Motley's testimony that Lenoir brought him money the day after the robbery and told him to keep his mouth shut was never contradicted. In fact, Lenoir fails to address this testimony in his argument on this issue. Lastly, we note that the record indicates that the trial judge correctly instructed the jury on accomplice testimony and that "[i]ssues of witness credibility are properly resolved for the jury." *Cowart*, 178 So. 3d at 667.

¶26. In sum, the State presented evidence suggesting that Lenoir planned, committed, and confirmed the robbery. The evidence supports the contention that Lenoir planned the robbery, because he told Motley that he was going to "hit a lick" to come up with some money just hours before the robbery. The evidence also supports the contention that Lenoir committed the crime because of the physical descriptions previously mentioned. Lastly, the evidence supports the contention that Lenoir confirmed the robbery by giving Motley money and telling him to keep his mouth shut. For these reasons, Motley's testimony was "sufficient to convict [Lenoir]." *Id.*

¶27.   Lastly, we conclude that the State presented sufficient evidence for fair-minded jurors to convict Lenoir of conspiracy.[5] The evidence clearly shows two men working in agreement with each other to rob the Dollar General store. The men entered the store together, held up the employees at gunpoint, took the money, and ran off at the same time. This issue is without merit.

**II. Whether the trial court erred when it denied Lenoir's motion for a new trial, as the verdict was contrary to the weight of the evidence.**

¶28.   Lenoir next asserts that the jury's verdict was contrary to the overwhelming weight of the evidence. "A challenge to the weight of the evidence is raised in a motion for a new trial, and is addressed to the trial court's discretion." ***King***, 47 So. 3d at 665 (citing ***Bush v. State***, 895 So. 2d 836, 844 (Miss. 2005)). The standard of review we employ while reviewing such a challenge is well-settled:

> On review, this Court will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Unlike a reversal based on the sufficiency of the evidence, a reversal based on the weight of the evidence does not indicate that acquittal was the only proper verdict. "Rather, as the 'thirteenth juror,' the court simply disagrees with the jury's resolution of the conflicting testimony." Nonetheless, the power to grant a new trial should be exercised only where the evidence preponderates heavily against the verdict.

*Id*. (citations omitted).

¶29.   Lenoir admits that the defense put on no proof of its own, but he argues that "two of the three witnesses utilized by the State, provided testimony, when properly analyzed, that supported the defendant and his innocence and did not weigh in favor of guilt." Lenoir points

---

[5]Lenoir does not directly attack his conspiracy conviction in his brief to this Court; but he does argue that insufficient evidence was provided to tie him to the robbery at all.

out that Forrest and Thomas both testified that they were well-acquainted with Lenoir, but that neither could offer any evidence identifying Lenoir as one of the robbers. Lenoir argues the surveillance videos and testimony show that both Forrest and Thomas "had ample opportunity to see and hear the two men that entered the store." Lenoir also points to the lack of physical evidence connecting him to the crime.

¶30. We find that the "evidence [against Lenoir] did not preponderate so heavily against the verdict that the failure to grant a new trial would sanction an unconscionable injustice." *Id*. Though Forrest and Thomas knew Lenoir from prior encounters, the evidence shows that the robber alleged to be Lenoir wore a hooded sweatshirt partially covering his face when he entered the dimly lit store. Further, Lenoir's contention that Thomas "had an ample opportunity" to view the taller robber is not as clear as he suggests. Though the video shows Thomas encountering the man with the gun as he exits the restroom, the video also shows that Thomas dropped to the floor just seconds after noticing the handgun. Further, because of the blurry nature of the video, we cannot conclude that the video contradicts Thomas's testimony that he tried not to make any eye contact.

¶31. Even more, this Court cannot conclude that the overwhelming weight of the evidence suggests that the employees should have recognized Lenoir's voice during the commission of the robbery. As previously stated, the video of the robbery has no audio component. Further, Forrest's testimony shows only two instances in which the robbers spoke, the first being "Give us the money," and the second being "We want the money from the back." And regarding these two statements, Forrest could not recall which robber uttered the commands. Because the record does not indicate that Lenoir spoke to an extent that his voice would

12

clearly be recognizable to Forrest and Thomas, the trial judge did not err by denying Lenoir a new trial.

¶32.    Lastly, the fact that there is no physical evidence tying Lenoir to the crime scene does not mandate that Lenoir be granted a new trial. "The absence of physical evidence does not negate a conviction where there is testimonial evidence." ***Burleson v. State***, 166 So. 3d 499, 512 (Miss. 2015) (quoting ***Brown v. State***, 130 So. 3d 1074, 1082 (Miss. 2013) (quoting ***Graham v. State***, 812 So. 2d 1150, 1153 (Miss. Ct. App. 2002)). On cross-examination, all three of the State's witnesses admit that they never saw law-enforcement officials dust for fingerprints or seek to procure other DNA evidence. And admittedly, the prosecution failed to trace Forrest's recovered cell phone and Motley's recovered cell-phone case to Lenoir. However, the testimony and video evidence show that both robbers were wearing gloves; thus, searching for fingerprints may not have yielded any incriminating evidence. We find this issue is without merit.

### CONCLUSION

¶33.    For the above-mentioned reasons, we affirm Lenoir's convictions.

¶34.    **COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF SIXTEEN (16) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II:  CONVICTION OF ARMED ROBBERY AND SENTENCE OF SIXTEEN (16) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF CONSPIRACY TO COMMIT THE CRIME OF ARMED ROBBERY AND  SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN COUNTS I AND II SHALL RUN CONSECUTIVELY.  SENTENCE IN COUNT IV SHALL RUN CONCURRENTLY WITH SENTENCES IN COUNTS I AND II. COUNT III IS DISMISSED.  APPELLANT SHALL BE GIVEN CREDIT FOR TIME SERVED WHILE AWAITING SENTENCING.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**